Thank you sir. Please be seated ladies and gentlemen. And welcome to all of you to the Appellate Court of Illinois, 1st District, 1st Division. We're happy to have you with us here today. I believe we have one case on the call madam, is that right? Alright. And I want to remind the lawyers that are here that the rules provide for up to 20 minutes for argument. You don't have to take all that. And if you have more questions, we're going to go longer than 20 minutes, but it'll see. You get 20 minutes at the most. I'd like the lawyers just to stand at their places if they will, or sit, whatever you like. And identify yourselves for the record please. Counsel. Good morning Your Honor. It's Jonathan Easting of the Office of the State Health Defender on behalf of Mr. Lyons. Thank you. Mr. Easting. Good morning Your Honor. My name is Marcy Jacobs. I'm an Assistant State Attorney representing the people of the state of Illinois. Alright. Thank you very much. You'll be seated. And please be confident in the fact that we have read the briefs in this case and reviewed it very carefully. Most, not all the record, but most of the record for some of us. And the attachments there too. So counsel, are you ready to proceed? Yes sir. Alright. And these are not for amplification, but for recording, so that you understand that as well. Thank you. Good morning Your Honors, and may it please the Court. Oh, sorry. Before you say anything, we must call the case. Thank you, Madam Clerk. Will you call the case please? Case number 14-13-34, People v. Lyons, Richard. Thank you, Madam Clerk. May it please the Court. Yes. So has anyone been convicted on as speculative and convoluted a theory as the State offered in this case? And it seems we can't find any analogy in the case law where there's this much evidence that is clearly exculpatory on my client's behalf. I'd note that a theory of guilt that merely relies on what is theoretically possible or the highly improbable is not sufficient to convict. I intend to argue the sufficiency of the evidence is raised under Issue 1 of the Code. I'd also note that especially in light of the State's concession that the Court erred in the voir dire of the jury on questioning them as to whether they accepted the presumption of innocence among other errors. If this is a closely balanced case, this Court should at least order a new trial. Many of the same reasons that the evidence is sufficient are reasons that the case is closely balanced as well. First, let's look at what the State didn't offer here. We have no motive at all for why my client would kill his daughter. We have no knife is ever recovered that's linked to my client. There's no eyewitness or earwitness to any actual violent act. And then we have Mr. Ryan's actions surrounding this incident. Not only does he, while out there searching for his missing daughter, approach a uniformed police officer on the street to inform her that his daughter is missing, he does exactly what you'd expect a father in this circumstance to do, which is he searches the neighborhood. When he finds Maya, he rushes her to the hospital. Along the way, he does something, he acts completely irreconcilable with any kind of consciousness of guilt by introducing additional witnesses into this van as they're trying to get her to the hospital. What condition was she in at that time? Excuse me, Your Honor? What condition was Maya in at that time? The medical evidence shows that she was clearly deceased at that point. Right. Because we have, you know, Dr. Sina's testimony indicates that the cause of death was actually this combination of a blow to the head and strangulation and that the later, you know, stabbing injuries either occurred, you know, likely occurred after death or almost immediately before death. She was suffocated before she could stand. That's Dr. Sina's testimony. It's either suffocation or there's a head trauma that seems to be more focused to Dr. Sina's testimony. Counsel, can I ask you about what evidence there is in the record relative to what blood evidence was connected from Maya, Maya's blood, either on her father or the defendant or in his vehicle? How many instances of that, number one? Do you have them by number? Do you know how many there are? Well, it's, you know, we're dealing with dozens upon dozens of different types of evidence. Let's start with this person. Almost all the blood evidence on this person is exculpatory because even the state's own expert, you know, Dr., you know, Mr. Engler, testifies that this is, you know, the evidence on his shirt, the evidence on his shorts is consistent with what he says occurred, which is carrying her, you know, carrying her from where he found her in this alley to the hospital. Did Derek carry her? Derek carried her into the hospital. I misspoke there. It's my client that carried her from the alley and placed her in the van. But it's Derek, the uncle, that carried her from the van into the hospital. And, you know, those two things, we have similar types of blood patterns on the clothing. Now, on my person, Engler goes into this speculative kind of over-read of a few small drops on the shoes. The state neglects to ever collect these shoes. And so they're only available in the one photograph that my client can send to be taken. And as we are going to… The few drops were on the white tennis shoes at minimal? There's a handful of drops on the white tennis shoes. They're on the side and center of the tongue of those shoes. Those shoes were never collected, so they were never tested. We don't know if they were Maya's blood at all. I'd further note… No Mr. Lyon's clothing? Well, most of the blood on the clothing is what Engler testifies would be consistent with him picking her up. That's why the state comes up with this theory of, oh, he must have changed his shirt, or invents newly that he must have changed his shorts. That means Lyon's as opposed to Derek. Yeah, the blood evidence on the shirt and shorts is… consistent with having picked her up from that alley. He's relying on this theory of these projectile droplets. Okay, let's talk about… Is that your argument on the body then, on the defendant's body? Well, the state tries to disavow the blood spatter on the defendant's actual person with the exception of a few droplets on the shoes that are captured in a single photograph. So as far as in the vehicle, let's go there. Yeah, in the vehicle. First, I'd note that we don't have any testimony at all that there's exclusivity of access to this vehicle. The… The van? The van. I mean, I'd note, for example, that some days after this event, when there's a detective that comes and does a sneak and peek into the van at the Lyon's home, and even on that point, their van's just parked outside, unlocked, and the detective just opens the door. That's the only kind of evidence we have as to what the typical access of this van was other than it's parked behind this house. Now, and… The locations of blood that were proved or at least entered in evidence that were hers in the van. Yes. There is… What we do have is a large area that's consistent with, you know, my client's, you know, account when he's immediately taken into custody, which is, well, not even… well, years before he's actually taken into custody, which is that there's a pool on the floor of the van that's consistent with placing her there. Now, the… Now, what Englert's focus is is showing that there's some of these additional droplets. The state claims that some of these additional droplets in the van, and there's seven dozen of them, are the kind of droplets that somehow can only be made from impacting a bloodied surface with a weapon and not from, first, replacing somebody down in the van. Okay. And it was that that was inconsistent with your client's statement to the police as to what occurred that night. Those droplets, if in fact they were caused by stabbing within the van, is completely inconsistent with your client's statement. Yeah. The state's case hinges on those droplets in the van and the speculation as to the droplets in… the droplets on… On the shoes. …on the shoes that he was relying on this enhanced photo of, which, you know, raises some of the questions that we raise under Issue 2, which is, you know, is there enough foundation for this kind of really sweeping testimony that Englert provides in this case? And there's a number of problems that are raised… Tom, I want to stay with the droplets of blood in the van. Mm-hmm. How many instances of droplets of blood were tied to Maya? Well, there's… In the van, almost all of the droplets of blood are tied to Maya. So five, 20, 50… It's in the dozens, Your Honor. If, you know, the photos… So not more than 20. It's likely more than 20. Whether it's more than 100, I couldn't tell you. It's dozens upon dozens of droplets of blood. But remember that it's undisputed that he's placing that there was… that much of the blood in the van, the blood that's on the floor of the van, is from placing Maya in the van in order to rush her to the hospital. Let's talk about the location of those droplets then. Mm-hmm. Are there some that weren't in the general area of where she was laid on the floor? There's some there, and then there's a few that are farther away. There's, you know, some that are on the dashboard, the skirts of the seats, and one of the armrests of the seats, and I believe one of the window shades of the interior of the van. So when you say a few, how many? Well, it's probably nearly a dozen that are in the other locations. So away from the area where she was placed. Yes. Okay. What we have, you know, is the only theory as to how those get there relies on Englert. Not only do we have Englert, you know, making this kind of guess as, I'm just assuming that everything is blood and it's Maya's blood, when these shoes aren't even collected. Some of the spots in the van test negative. He treats them as if they were, you know, assumed to be Maya's blood. Well, again, of what evidence there was that were her blood. That's what I'm trying to get to. Several of the spots were tested in the van, not all of them. Most of them tested positive. Some of them tested negative. The shoes, which is the only one that was never tested. There was rigorous cross-examination on Mr. Englert as the expert. But what does this do in relation to whether we go by the weight of the evidence or is this even made admissible? Well, I'll submit that's an admissibility question, and it's not an admissibility question. It certainly goes to the weight of the evidence as well, which in this case would show that the case is closely balanced, which would require a reversal under issue number four. You know, there's people before that, we said it's in the brief, that talks about how, you know, when there's unfounded assumptions of expert testimony, that testimony is, you know, not admissible. Here he's making this express assumption that everything is Maya's blood, but we either have untested things like the shoes or things that tested negative in the van. Counsel, can I ask you, did defense counsel on the record state that he had no objection to Mr. Englert's qualification to testify as an expert in blood pattern analysis? That was subsequent to the FRA motion to exclude Englert's testimony being denied. Right. And the Court asked him, then he said he had no objection. I refer the Court to P. Povey Herron, which speaks about what the phrase no objection articulated by defense attorney means. In that case, Herron's seminal point error case, the Court said, if anything, no objection is mere forfeiture. I'd further note that despite the State's citation to the overturn case in Denson, you don't have to renew an objection during trial, and that a motion to exclude the blood spatter testimony on the FRA basis is sufficient to preserve these foundational questions. And he also objected, did he not, to his crime reconstruction testimony? Yes. He said. Yes. He drew a line as to what he objected to. If I recall, the State argues that there's no real distinction between crime reconstruction and blood spatter, given that our standards on the sufficiency objection are things like close enough or the same essential issuing from cases like Moore, that would be sufficient to preserve. And I note that given the closely balanced nature of the case, just like in Evans, where the blood spatter is that central, that it would have to be addressed as point error regardless as we argue in the reply. You talk about closely balanced, and this is an unusual closely balanced, because there was no alternative theory really offered. There was a circumstantial case by the State. I think we all agree it's circumstantial. There was no direct testimony. And then no alternative explanation. Is there any evidence in the record that suggests any alternative explanation for either Mr. Lyons doing the cover-up because somebody else committed the crime or for somebody else committed the crime? What's the alternative to this circumstantial evidence? Well, the first, I look toward his statement that the State actually introduces. That's a purely exculpatory statement. And much of the State's case is actually trying to contest that statement. Right. Because some of the scientific evidence is actually inconsistent with that statement, is it not? Well, a lot of the scientific evidence is, in fact, consistent. So it's consistent. Which is exactly the kind of thing where a common-sense assessment would say, you know, under the Bonappe standard, would say that this is a closely balanced case. And because he does have that exculpatory statement, that is officially plausible on it. In fact, it's a lot more parsimonious than this convoluted theory by the State. I'd submit the Court can look at a case like P.V. Naylor, which talks about when we have a contest of two disputed credibility and a contest of credibility of different accounts of events, and either of them is facially plausible, the case is necessarily closely balanced. And I note that, you know, the State can't offer any case that hasn't been found closely balanced, that has no motive at all, no eyewitness, and relies solely on this kind of speculative testimony. Further, I note that, you know, especially given the concession in Issue 4 on the 431B error, there's other errors that are raised that... Can you clarify for me exactly what the problem was in the jury instruction? The most important problem with the jury instruction, which the State concedes, is the Court's failure to ask the jury if they, the potential jurors, if they accept the principle of the presumption of innocence. So they instructed the monitor, but he didn't ask them if they accepted it. Yes, that's correct. And in this case, Your Honor, I'd submit, I would say more than any other, a proper instruction, a proper, you know, vetting of the jury for acceptance of the presumption of innocence is crucial. Not only do, you know... And also no need to present evidence. And also no need to present evidence. The Court conflated those two, and there's some additional confusion in this question about, question about accepting the reasonable doubt standard, but the most, but the core one that's conceded here, and it's been found sufficient in cases like the EULA, is the failure to ask about the presumption of innocence. This is exactly the kind of case where the presumption of innocence was crucial, precisely because we don't have any evidence offered of consequence in the defense case. And the very nature of the case is so emotively, you know, compelling, that, you know, this jury wouldn't necessarily have been looking for somebody to convict. It's the kind of case where emotion overtakes reason. And moreover, it's the kind of case where the State fronts the defendant's exculpatory account and then tries to attack that account. That kind of strategy, though it's, you know, a perfectly acceptable strategy, poses a certain threat to the burden of proof and presumption of innocence, so that would be especially necessary for, to have a robust presumption of innocence in this case. Counsel, I know you have an argument relative to the fact that defense counsel didn't object to the qualifications relative to the blood spatter expert, but couldn't there have been an expert, if you want to call it that, on blood spatter offered on behalf of the defendant and explain away a different opinion as to what the splatter showed? Your Honor, of course, the defendant doesn't have any obligation to try to do a dueling expert. I would suspect at a retrial that Mr. Lyons would retain such an expert. I would also, you know, point the Court briefly, I'd like to discuss the final issue that's raised in the briefs, which is that the jury never heard of Terry Robertson. Mr. Robertson, a.k.a. Robertson, was the first person arrested for this crime. Even if this Court would accept that some of his statements, that he was there in the alley and while the body was fresh, wouldn't come into evidence. Robertson, you're speaking of? Terry Robertson, Earl Robinson. He says his name is Robertson when he's invoking the fifth, so that's the name I went with. He's a choice. He's not, you know, he's the drifter in the neighborhood that's been arrested for these various crimes. Well, weren't those incriminating, though? Well, Your Honor, under the chamber standards we've looked to, does justice reform and admission is the kind of thing that the State would use. Here, not only did the State optionally use it, they went and got a search warrant based on this and arrested him. But you can easily imagine what a State's attorney closing argument would be like when the defendant on trial has made the statement, I was right there in the alley when the body was fresh. It certainly is the kind of thing that a State's attorney would use. Did he say when the body was fresh, actually? Those were his words, Your Honor. And the statements to, and he made similar statements to. . . The body smelling, there was a comment about that. Yeah, that he didn't smell the body because it was fresh. It's that kind of disturbing comment. And even if that statement doesn't come in, counsel at the very least should realize when the State is painting this picture of a murder that it actually leads to my client's arrest, the fact that somebody else was arrested first is certainly relevant and undermines the effectiveness of the State's investigation. Even without those statements, counsel should have brought in some facts about Robertson at trial. His failure to do so let the State, in closing argument, get up and mock the defense case by saying it relied on a mystery ghost burglar when counsel could easily have at least provided the jury the name of Mr. Robertson. I have two questions on that issue. First of all, do you think Chambers sets any different standard than our own rule of evidence? Do you think it's a different analysis? Chambers is actually a fairly broad standard. There's a wonderful description in the area of Sixth Amendment law that comes in the Seventh Circuit's Harris case that's set in the opening brief. It goes through and summarizes all of those. The fundamental question here is, hey, if the mechanical application of the rule of evidence gets in the way of something that's necessary for justice, then that mechanical application has to fall. The standards as to a penal statement are fairly similar between, you know, some of the Chambers law and Illinois law under the rules of evidence, but I would suggest the Court would look at Harris. Chambers is less mechanical, more like less fair here in terms of. Yeah. Yeah. Chambers requires rejecting the mechanical when it gets in the way of justice, Your Honor. And then here's the other question. I forgot the other question, but I'll come back to it. All right. Can the defendant, Chambers, take the fifth? I can't recall on the facts of Chambers, Your Honor. I'm sorry. Yeah. I would refer the Court to cases that, you know, there's cases that are set in the brief such as Tenney and Cruz, and I know in some of those cases we do have a declarer taking the fifth. I'd also note here that cases like Cruz and Gray note that, hey, it would be easy for the State to offer somebody immunity so we can, you know, actually have all the facts before the jury at trial, and the State here declined to make that offer of immunity. But he did take the Fifth Amendment, so that somehow changes things, does it not? It doesn't, you know, I mean, it shows that he's an unavailable witness, which is additional reason why it's taken. So let's take him out of the equation because he takes the Fifth Amendment. What about the statements made by other people that you wanted to get in as well? Doesn't that – don't they just point to the fact that he could have been in the area? Is there anything else those statements suggest? Well, I'm not sure which statements you're referring to because I'm looking at Robertson's statements to the three friends. Yeah. Other persons at right were identified. Those are the statements that are at issue here. If those weren't incriminating by Robertson, then why did he decide to take the Fifth Amendment and not testify? That's a question for Mr. Robertson, Your Honor. And if the State is correct in the not incriminating, then we suggest it would be easier for them to offer Mr. Robertson immunity. Was he offered? Not as far as I know, Your Honor. I do recall my other question, which is what is your response to the State's argument that the arrest itself of Mr. Robertson wouldn't even be admissible? Isn't relevant? None of it would be admissible. It would be compelling. Kyle's v. Whitley is what we say in the briefs. You know, it's a fairly standard defense tactic to question the effectiveness of the investigation. I would also note that the jurors would then, even if they don't accept Robertson as an alternate suspect, they'd be comparing the police treatment of Robertson to the treatment of my client, which is, you know, for example, if Robertson is found with a knife of unknown origin, the State never finds any knife linked to my client. For Robertson, he's actually let go, and the blood on his shoes from this unexplained cut he has on his hand is tested, and, you know, tested when the State does the proper investigation. Here the State neglected to even collect the blood on my own client's shoes, and instead is simply asserting that it belongs to me. So he was doing that, but as I recall, and tell me if I'm wrong, the record was they went and did a search of his house, and none of that clothing was recovered. Yes. The search of the house later, they didn't recover the clothing because they didn't bother to collect it at the initial time. No. As a rep, I never discovered. There was no knife discovered, Your Honor. I have. I have a four or five-inch knife. Yeah. Robertson, he's found with a four or five-inch knife. The girlfriend says, we don't know. You know, this is the first time I've seen this knife. He has a cut on his hand that he explains is from working on an automobile. Through the rubbing of his hand. Yeah. Yeah, from an automobile, that he explains is working on an automobile. I'd also note, you know, someone interlocks with Dr. Sina's testimony that talks about how somebody inflicting these multiple stab wounds would be likely to cut myself. There's no cuts on my client's body. There are cuts on Mr. Robertson's body. Counsel, isn't it the problem to the jury to decide what weight to be given any evidence? Your Honor, I would suggest, especially on the Chambers thing, that, you know, that would be an argument for why that should be before the jury. And I would say – I'm talking about – I'm going back to the blood analysis. Mm-hmm. The splatter. I mean, they determined what weight they should give that evidence. Is that right? When you talk about sufficiency. Well, as the weight is reduced, then the question of admissibility comes in. Because when you have a sweeping conclusion, as Mr. Englert offers, that this is the only way this could have happened, then it ends up becoming a more unfairly prejudicial than prohibitive as the foundation is cut away. And even if we treat that as a deficiency standard, it's improper to defer to the jury on a closely balanced standard when our question is did this error that occurred at trial impact the jury's evaluation. There we make our own common-sense assessment of the evidence. Counsel, thank you. Thank you, Your Honors. Do you want time for the vote, Counsel? Yes. Counsel, I'll hold back two minutes, please. Yes. Good morning, Your Honors. I'm Assistant State's Attorney Marcy Jacobs. Your Honors, it is true that in the large amount of evidence in this case, it includes circumstantial evidence and blood splatter evidence. But contrary to what defendant is implying, circumstantial evidence and blood splatter evidence is actual evidence. It is subject to the same reasonable doubt standard of any other evidence, which this Court well knows at this juncture, is that it must be viewed in the light most favorable to the State. And while it is not necessary that each individual piece of evidence in the chain of circumstances establish defendant's guilt beyond a reasonable doubt, it is sufficient, as here, that once all those individual pieces are put together and linked up, they paint a picture, as they did here, that there is absolutely no question that the defendant killed his daughter, Maya, in this case. And I would like to start with the physical evidence in this case. The jury heard that at the time that the defendant purported to find his daughter, that she had some 13 stab wounds all over her, and her clothing was covered with blood splatter. And not just any blood splatter. Medium-velocity impact splatter consistent with a stabbing. And that's a very distinctive pattern. It is a random distribution of large and small drops produced when energy is applied to a blood source. But there was a question about the pleural cavity, because there was no flossing of any blood that came from her carotid. Well, when he – what was established is that he stabbed her primarily in her abdomen area. He disemboweled her. What? Yes. She was disemboweled. She was. Her intestines, her – yes, she was. And so that is the blood source that was created at that time. So my point is, is that when the jury heard that when she was found, she had this blood splatter, this distinctive blood splatter all over her clothing, and at the same time, he puts – the defendant puts her in the middle section of his van with the same exact pattern, the same exact medium-velocity impact splatter. Didn't he have it between his legs in the van? Well, yes. In fact, he did, and that is my point. And at the same time that he had all this medium-velocity distinctive blood splatter consistently stabbing, it was all over his van. It was also all over his shoes. So when the jury – But not the van, because they picked up the covering. I'm sorry? But not the van, because they picked up the covering to take the – the blood was covered on a piece of a covering of either a – Oh, but that was just one – that was probably a floor mat, but there was this medium-velocity impact splatter all over – and it looked like a scene out of a horror movie. I mean, these – it was covered, the entire middle section of the van. Can I get to a number? I want to get to a number. Yes, I know you do. I'm not going to disagree. It's about a dozen of droplets that were tested when they – the first night when the forensic investigator took photographs of all that medium-velocity impact splatter, he tested certain spots, and that – it would have been impossible to test every single spot. There were hundreds and hundreds. Then later, more spots were tested. The flashlight that was in the middle of that section was found to be Maya's blood. This is in addition to already the main spots that were tested. The blinds were tested. They were consistent with her blood, and there was some found in the front dashboard, deep into the front dashboard, that was consistent with blood, but it was cleaned at that time, so some of it was found not to be consistent with blood, and then there was other splatters that weren't very foul. But I want to make – the point I want to make is that the jury saw the pictures, and when they were told about that position, the defendant had Maya in when he was stabbing her, and how it was mostly in her stomach. That's the blood source. And they see all that – they see the pictures of the splatter on her clothing, in the van, on his shoes. It all matched. I mean, there's no other reasonable inference from this evidence that that is how the blood splatter got on defendant's shoes, in the van, and on her clothing. And they heard about this blood splatter evidence from a preeminent expert in this country, but again, nobody disputed his expertise. Defendant did not – does not unappeal. He's abandoned his fraud claim unappeal with good reason because blood's – I'm sorry? Well, Friar, it wasn't – unless you see something that's new and unusual. No, and courts all over the – Illinois courts and courts all over the country, and frankly, we have found no court that has not found this to be reliable evidence. So they heard from one of the most preeminent blood splatter experts in this country. They heard him talk about that this blood splatter looks like this distinctive pattern that I've described, but he didn't rest on those laurels. He didn't just want them to take his word for it. In fact, he showed them a live demonstration. He literally showed them several different types of blood splatter patterns, and I didn't talk about cast-off pattern, which is one of the types he talked about, which is that's the blood – yes, and that was found on Maya's clothing and in the van. And he showed them. He had a blood-like substance there in court. He's throwing it around and showing them that an instrument, when it strikes it, a source of blood, that that is, in fact, the pattern that they would see. So this was all given for the jury to see. They – this was up to the jury to determine this. And I want to point one thing out, that defendant made a material misrepresentation of the record when he said that this blood expert said that the blood stain was found on the defendant's shoes, that they were consistently dropping blood. It was like a 90-degree drop was one of the types of blood he – absolutely. I don't believe he said that. He said the opposite. I don't believe the defense counsel indicated that. Okay. I think that's correct. Okay. I'm sorry. So if he didn't, he didn't, but he said the opposite. He was asked by defense counsel several different types of other kinds of spatter it could be, and our blood expert said – our blood spatter expert said, no, it cannot be any of those. It was based solely on one photo of the shoes, right? Absolutely. That's all that there was. Absolutely. A crystal clear – That was a 90-degree drop? It was not a 90-degree – it could not have been a 90 – it drops from holding her. He absolutely said it was not. And that was uncontradicted, uncontested evidence. That is the only evidence about what kind of pattern this blood was that the jury heard. And to get to your point, it was one picture. It was a crystal clear picture taken by the forensic investigator hours after the murder that clearly shows defendants' shoes, and you can see the blood-like substance, the red stains on his shoes in that pattern. And then there was another – more large pictures where you could also see that medium-velocity impact spatter. And those were the same types of pictures he used to describe the van. He only was able to talk about the spatter in the van through pictures, too, and those were never contested, that there was anything informed about those pictures, they were never objected to. So the jury accepted those as reliable evidence, as any other reliable evidence in this case, as they should have. They were never objected to. And what the expert could really – all the expert could really establish, and this is a question, is that Maya was stabbed in the van, right? That's what he could establish. Yes. And he applied this to the position of the person holding her at the time she was stabbed. And I would say to you that the fact that defendant shows up with the same medium-velocity impact spatter on the day, not even on the day, at the time that his daughter was stabbed and has the same pattern on her is an inference. There's no other reasonable explanation for it. But let me just say, the expert never testified it was blood. He testified it appeared to be blood or it was consistent with blood. He never purported to say that the nature of the substance was blood. But I want to point this to this court, to the case of Pippo v. McLaurin, the first sister case that I cited in my brief. They had a very similar situation where there was a bloodstain found on a defendant's shoe, and they were tested, but they weren't determined whether they were animal blood or human blood. And this court found uncritically this was not a foundational issue. The foundation to establish the connection of that shoe to defendant, he had been arrested wearing the shoe, and to the case, because some witness said they observed him wearing a shoe that looked similar right after the murder. So it was not a foundational issue, and they said specifically, this is a great issue for the jury if the jury wants to find that those red stains, blood-like looking stains, and we don't know if it was animal blood, is connected to the murder in this case. And that is exactly what we have here. It is for the jury to determine if that incredibly distinctive medium velocity impacts better on his shoes. If there was any other reasonable explanation for it. Can I change the subject for a minute and talk about what happened before the stabbing and the connection of the lockbox to certain marks on the body? Yeah, and that's what I would say. Again, this was uncontradicted evidence. The defendant's theory in the case, as well as ours, there was no contradiction. The jury heard from both sides that she was, her first injuries, her head injuries, her asphyxiation injuries occurred by that lockbox in the back of the house when she was thrown up against it. It was attached to a metal pole. And again, the jury heard that the defense agreed that Maya was actually stabbed in the van and that the alley was not a crime scene. He agreed with that, and that is all the jury heard. And this was uncontradicted and uncontested evidence. But she had suffered concussions from her head being pushed against her upper cranium. In many places, in more than one spot. She had several cracks in her skull, absolutely. And so my point is, all this physical evidence, you put it together, you see the pictures, the jury saw the pictures, it just matches, it fits together. And there must be, at this point, taken in the light most favorable to the state. And then you add to that all of the evidence of the defendant's behavior at the time of the murder. Let's talk about the defendant's behavior. What about him stopping and talking to a police officer at a time when, in your theory, he had already stabbed Maya and the van was already full of blood, right? He stopped and talked to his neighbor who was a police officer? Absolutely, the middle section of the van was full of blood. And he, it was pitch black, and there's no testimony that he, the testimony was that she was several feet from the car. So he's driving by, she's getting into her car, several feet apart. He calls out to her, have you seen my daughter? And she says, yeah, I saw the girl in the pink in the alley. And you know what? He says nothing, not a word. And you know what? He doesn't drive into the alley. He drives off the block. Okay, I understand. But at the same time, she could have. She's a police officer. She could have said, you're looking for your daughter, let me help you. She could have climbed into the van. It doesn't feel consistent, does it, with your theory that he would do that? You know what, the defendant makes that argument. But basically all that argument says is he's trying to find any evidence compatible with innocence, that could possibly be compatible with innocence, and to try to raise that to a reasonable doubt. But that is not the standard here on review. That standard was rejected years ago. So what the standard here is for the sufficiency of the evidence is to look at the evidence that was there and that the jury rated. And if that individual piece of evidence didn't prove defendant guilty beyond a reasonable doubt, that's not the standard either. It's how it all links up with all the other evidence. But he went home and he changed his shirt. He never called, 911, never. He is driving this big conversion van around when he has a smaller, more convenient car to be driving around because he knows that he has to get Maya back in this middle section to explain all that blood, and goes off the block. There's no indication Maya's not anywhere but on the block. He's getting rid of the evidence because he knows. And when he does eventually end up in the alley and find Maya in a crime scene, in an area where there is no evidence of a crime scene, he still doesn't call 911. There's no evidence he tried to do anything to help her condition. He throws her. She's already dead. Well, I don't know that he would know that. He throws her in the floor behind him, and then he doesn't even know where to go. According to his own statement, he has to go home and pick up his Uncle Derek, and Derek's the one who has to suggest to him, well, how about going to a hospital? So they go to the hospital. The defendant doesn't carry his own daughter in with these grievous injuries. He sits in the parking lot, and he sits there. Because according to his own statement, he doesn't want to go in because he doesn't want to answer the questions that are going to be inevitable. And when he eventually makes it into the waiting room, but not the emergency room because that's where his daughter is, and the nurse and the doctor have to go looking for him to tell him she's dead, he asks no questions about her cause of death, about any of her injuries, because he knew what they were because he inflicted them. And when they asked him, when the nurse asked him, why didn't you call 911, why didn't you go to a closer hospital, he had no answer. And that was the same for the detective. When the detective, he talked to the detective, he didn't ask him any questions about her cause of death, her injuries. He just came up with this exculpatory statement, but he didn't know he was caught because he didn't know he was seen on the block. But the things he said he did, he didn't do. And he did go out in that van within the next day, and that detective did not really say he didn't notice the spatter all over the van. He said it was not there, and the first time he noticed it, he saw it, was in the pictures in the following week when they were developed. And, you know, he's letting his four-year-old daughter still play at the end of that block in that creepy dark alley. Let me ask you a couple questions about Robertson. First of all, couldn't the state have just avoided this whole problem by giving him immunity? You know, the point is it never got to that point, because what defendant seems to be arguing is that the reliability, you know, factors that go to the reliability of the statement make the statement either one of a penal statement or not a statement against penal interest, and that's conflating the considerations in Chambers. Under Chambers, we don't even get to the analysis of whether the statement was trustworthy and reliable until it's first determined that the statement was actually one against penal interest. So we don't even get there in this case. Okay, taking the fifth, isn't it necessarily against penal interest? Not against penal interest in this case. Right, there doesn't have to be penal interest in this case. I would suggest in this court it absolutely does, because every case that was cited and the state has found with no other cases all talk about only an actual confession to the crime for which the defendant is charged for. That's what they all talk about. That's what they talk about, but if the notion, and this is the notion, and I don't know if I totally agree with it, but it's the notion is you don't make statements against penal interest unless they're true. That could be you could confess to a different murder. It could be against penal interest for a different reason, theoretically. But then it wouldn't be relevant to this case. Well, it's relevant to this case because of the proximity it puts him in, not because of the theoretic. But Mayor Preysen, I mean, People v. Luna is very clear. Mayor Preysen's proximity is not enough. And, I mean, the declarants in those cases have even, in the case of Luna, have even more suggestive of not being merely present. The first declarant said he was the last one to eat at the restaurant. The second declarant, his girlfriend, said she witnessed the crime and he was the one who did it. So that's even corroboration for the crime. But Luna was very clear. The statements that were made, and that's what you look at first. It's the threshold question. Until that question is answered, that the statement is actually one against penal interest, you don't even look at the rest of the factors. So the unavailability doesn't even come into play because it only comes into play in terms of one of those reliability factors, the one of whether or not he's available for cross-examination. So in this case, it never even came into play because the threshold factor was found that it was not a penal, a statement against penal interest. So it never even got that far. But you wouldn't even be trying to put in here, say, if he was available to testify. So, I mean, you've got to, that's the first question. He's available to testify. You say, Mr. Robertson, were you in the aisle that night? So if he's available, none of this happens. So if you had made him available and offered the fifth, then none of this would have happened. He just wouldn't testify. No, again, let me say, first of all, they never asked for that because they weren't, it was never asked for, it was never a consideration. There's no suggestion that they ever asked the state for immunity. There's no suggestion that the state, it was some sort of strategy not to give it. It literally only came into play as the fourth factor of Chambers, would he be available to be cross-examined. Because of the very narrow facts in Chambers. Those were the very narrow facts in Chambers. And to say now that you want to expand those to mere presence, well, you can't, because Zuma is very clear, and that's the precedent, which tells you why. The standard of review in this case is abuse of discretion. So the judge cannot abuse his discretion because he followed the precedent of this court. And what about the state then arguing in closing, you know, there was nobody else this bogus making, you know, sort of piling on perhaps a little from the fact that the defense could not put in this alternative suspect. Well, I will say that, I will say that that is not, whether or not, actually that's the point, whether or not they had a name for the burglar, whether or not they were able to put a name for the burglar, that would not have been able to change that closing argument. Because they still, that was the huge hole in their theory, that they did not explain why this burglar would need to even remove Maya's body when he was in no way connected to defendant's van. Defendant was the only one connected to defendant's van. And especially how he cut his body to the end of the alley. So even if they had Robertson's name to put in, they still would have had those huge holes in that theory that make them not reasonable. And don't serve to break the chain of reasonable inference that the state had put on and with all the physical evidence combined with all that circumstantial evidence, in no way serves to break that chain. And if we're following the correct standard of review, almost particularly like most favorite books of this state, there's no way defendant can say that no reasonable jury would have found defendant guilty with all that evidence. And let me say, my position is that it's actually overwhelming evidence, not even close to closely balanced, to have this defendant show up with this distinctive medium glossy impact spreader on his shoes at the same time his daughter shows up stabbed with the same pattern all over her and all over his van. All right. Counsel, sum up if you would in two sentences or? I would just, I actually just did. And to let you know that, let me just, to let you know that we absolutely have proven defendant guilty beyond a reasonable doubt. And all defendants talk about things that we didn't put in. That there was no motive or no life and his talk about the things he says are not compatible with guilt or the timeline or a false conflict between English testimony and the medical examiner's testimony. There really wasn't a conflict. But these are things, again, he's just asking his court to rewrite and retry the evidence. That's not the standard. He can't ask that. Everything that we have put on the jury was uncontradicted. And the jury, there's just no way the defendant can say that no reasonable jury would have found defendant guilty. Thank you. Counsel, thank you. Your Honor, to the state's argument that the evidence is uncontradicted, I suggest that's exactly the kind of case where the presumption of nuisance needs to matter the most and we need to make sure that the jury accepts these fundamental principles. If nothing else, I suggest that because this is a close and balanced case, this court should order a new trial under issue number four. To some of counsel's comments on the blood spatter evidence in Englert's testimony. The state emphasizes the theatrics, this little experiment that Englert performed for the jury at the outset of his testimony. However, as the NAS report and some of the things said in the briefs make clear, when we're talking about blood spatter, really what we're talking about is a matter of math and physics. That's also a question of measurement. And what's Englert's answer to those things? Despite what most of the reasonable experts in the field say, Englert's saying, no, you don't have to do it. I'm just going to look at these spots and I'm going to intuit exactly what kind of blood spatter they are. That's why counsel's cross-examination falls flat, because all it is is an assertion based on Englert's own judgment. And then, Your Honors, the state emphasizes these few spots on the shoes. I would ask the court to look at those photographs. I believe they're 240 through 246 of the state's exhibits. Crystal clear, they are not. It's a handful of pixels. It's a handful of pixels that Englert then somehow had enhanced by some never-explained method. We have no testimony from him that this kind of mysterious enhancements relied on by experts in the field. And it's arguably the only brief hardly ever addressed by the state. It's the kind of enhancement that alters the color and alters the boundaries of those blood spots where Englert's own logic says that the color and blood boundary are determinative as to what kind of spatter it is. That is simply not enough that it shouldn't be. At least that portion of his testimony should not have been admitted. And it shows further that a case was closely balanced or even insufficient to convict. Counsel, thank you very much for your presentation here today. Thank you, Your Honors. Both of you. Counsel, thank you very much. We will take the case under advisement and you'll be hearing from us shortly. Thank you.